### RITCHIE v. REO SALES CORP.

1. Witnesses—Impeachment—Contradiction.
   In this State a party cannot impeach his own witness, and to that extent vouches for credibility of witnesses produced by him, but he may contradict his own witnesses.

2. Appeal and Error—Evidence—Conditional Sales Contract—Signatures.
   In buyers' suit to set aside conditional sales contract for purchase of second-hand tractor and trailer and recover back money paid thereon, finding of court that signature of a buyer on the contract was genuine is not disturbed on appeal where the buyer testified as to its genuineness himself and then contradicted such testimony by testimony of handwriting experts.

Appeal from Wayne; Chenot (James E.), J. Submitted June 12, 1935. (Docket No. 75, Calendar No. 38,245.) Decided September 9, 1935.

Bill by William G. Ritchie and Orland R. Duncombe against Reo Sales Corporation, a Michigan corporation, and Frank G. Kratzer to set aside a contract for the purchase of a tractor and trailer, an accounting and other relief. Bill dismissed. Plaintiffs appeal. Affirmed.

*Ernest W. Ver Wiebe,* for plaintiffs.

*Foster & Cameron,* for defendants.

POTTER, C. J.    Bill to set aside a conditional sales contract by which plaintiffs acquired a second-hand tractor and trailer for highway haulage, and to recover back the money paid thereon. From a decree for defendants, plaintiffs appeal.

Plaintiff Ritchie had been a resident of Detroit and vicinity for 14 years, during all of which time he had been a locomotive fireman. Before coming to Detroit, he had been manager of a local draying business in Regina, Saskatchewan, employing three or four men. Plaintiff Duncombe was a graduate of a high school in Canada, had 18 months' business training in Canada and at the Detroit Business Institute, and was at the time of the trial, and had been for some time prior thereto, head of the invoicing department of the Aluminum Company of America, in Detroit.

Plaintiffs saw some advertisements in the Detroit paper for three-year hauling contract with Reo equipment, as follows:

"3-Year hauling contract
with Reo equipment

"This ad is addressed only to a few high-grade, dependable men who can handle $1,850 to $2,250 down payment on Reo equipment with service.

"A *bona fide* contract will be given to those who qualify by established, reliable company.

"No Sunday or holiday work. Earnings above the average. Stands strictest investigation. See Mr. Kratzer, 7 to 9:30 p. m. daily only. 2272 E. Jefferson."

Plaintiff Ritchie, after he saw this ad, visited defendants' place of business in Detroit, and the testimony indicates he visited the place four or five times a week until the sale in controversy was completed. Kratzer was salesman for the Reo Sales Corporation which had on hand a repossessed tractor and trailer which it was seeking to dispose of.

Plaintiffs make many allegations of fraud which they claim was perpetrated by Kratzer, the representative of the defendant company, who received the benefit of his misrepresentations. These, as stated in the bill, are:

That they could make a net profit sufficient to meet the monthly payments upon the tractor; that the Reo Sales Corporation would guarantee a job with the Motor Freight, Inc.; give a new guarantee on the tractor and trailer; furnish a man to teach them to operate the tractor and trailer; and that the Reo Sales Corporation had haulage contracts which it would be glad to let to plaintiffs.

Plaintiffs' first visit to the defendant Reo Sales Corporation was in April, 1932, and negotiations continued until well along in July. The record shows that probably by July 12, 1932, the terms of the sale had been agreed upon, and the trial court found that exhibit 18 was executed by the plaintiffs. This purports to be an order in writing, signed by plaintiffs, for a 4-ton J used tractor and highway trailer. It is dated July 12, 1932. Whether this was signed by the plaintiffs as they testified to, or not, as was sought to be proven by a handwriting expert, the record is undisputed the tractor and trailer were used equipment

of 1931 model, and these negotiations were in 1932, and that the equipment was not in condition for delivery immediately after July 12th—that is, on July 16, 1932, the Reo Sales Corporation ordered the equipment put in condition at a net cost to it of $841.95, and on July 25, 1932, this equipment was ready for delivery; and on that date plaintiffs signed the conditional sales contract, paid down a cash payment of $1,200, turned in a second-hand Chevrolet coupé for $150, and agreed to pay a balance of $3,704.32 in 16 equal monthly payments of $231.52 each. The order purporting to be signed by plaintiffs says "No warranty or guaranty," and the conditional sales contract, admittedly signed by plaintiffs, says "I, or we, have examined said chattel, and accept same in its present condition."

After the tractor and trailer were turned over to the plaintiffs and the initial payment made thereon, they went to the Motor Freight, Inc., and secured a contract for hauling; operated the tractor and trailer for approximately six weeks; made default in their first payment upon the contract (whereupon the credit corporation to whom defendant Reo Sales Corporation had transferred the conditional sales contract, repossessed the equipment), and kept the proceeds from such operation; and, prior to the time the property was repossessed by the finance company, did not make any complaint either as to the character of the equipment, the representations made to them, or the failure to procure a three-year contract as they claim they were advised they might, nor did they complain of the earnings which they made from the operation of the tractor and trailer.

The principal legal controversy turns around the order purporting to be signed by plaintiffs. Defendants, in response to notice upon them, produced all

papers relating to the transaction and among these was what purported to be a sales and purchase agreement signed by plaintiffs. It was marked as an exhibit for identification by the defendants, and was shown by defendants' counsel to plaintiff Duncombe, who testified, after an examination of the document, he signed the contract. Plaintiffs' counsel subsequently introduced the document in evidence, and later called a handwriting expert to testify the signature upon the document was not plaintiff's.

It is argued that plaintiff cannot impeach himself by introducing testimony tending to contradict his own; that by testifying to the genuineness of the signature on the document and introducing the document in evidence, plaintiff vouched for the authenticity of the document and the genuineness of his signature thereon, and may not introduce testimony tending to contradict his own. It may be admitted this was the ancient rule, but I think it is not the rule at the present time. A party, it is true, cannot under the law of this State impeach his own witness and, to that extent, it may be said he vouches for the credibility of witnesses produced by him. But a party may contradict his own witness for, if he could not do so, he would be at the mercy of the first witness who was sworn and testified. *Darling* v. *Thompson,* 108 Mich. 215.

The peculiar thing about this case is that plaintiff himself, after testifying to the genuineness of his own signature, introduced and sought to introduce testimony to dispute the genuineness of the signature which he had testified was genuine. This may probably be done if the plaintiff seeks to benefit himself by the contradiction of his own testimony, though it opens the door for the trial court to find plaintiff's testimony was unreliable and he, therefore, not entitled to be believed. Evidently the trial

court so considered this testimony and did not believe the plaintiffs. We find no reason to disagree with the trial court upon the facts.

Decree affirmed, with costs.

NELSON SHARPE, NORTH, FEAD, WIEST, BUTZEL, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.